IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>　　　　Plaintiff,<br>vs.<br>ANDREW EDWARD FLYER,<br>　　　　Defendant. | CR 05-1049-TUC-FRZ (GEE)<br>**REPORT AND RECOMMENDATION** |

The District Court referred this case to the Magistrate-Judge for hearing on pretrial motions. On January 30, 2005, hearing was held and evidence presented on the defendant's Motion to Compel Discovery and Inspection and Motion to Suppress. Upon consideration of the evidence and the arguments of both counsel, the Magistrate recommends the District Court deny the Motion to Suppress and deny the Motion to Compel Discovery and Inspection to the extent that motion would require the government to provide copies of the requested material to the defense.

**CHARGE:**

In a superseding indictment Flyer is charged with two counts of Attempted Transportation and Shipping of Child Pornography and two counts of Possession of Child Pornography, all occurring in March and April, 2004.

**PROCEDURAL BACKGROUND:**

Defendant was indicted on May 25, 2005. On June 2, 2006, he appeared, pursuant to a summons, for his arraignment and was released on bond on that date. On July 8, 2005, pursuant to a plea agreement negotiated by his retained counsel, the defendant pled guilty before the magistrate to one count of the indictment and the District Court Judge accepted the plea on July 25, 2006. Before sentencing, another retained attorney moved to substitute in as counsel for the defendant on October 12, 2005, and this motion was granted on October 14, 2005. On October 26, 2005, the District Court granted defendant's motion to withdraw from his guilty plea. The present superseding indictment was filed on January 6, 2006.

**MOTION TO SUPPRESS:**

On April 8, 2004, Special Agent Andrews, a member of the FBI Innocent Images Task Force, Sexual Assault Felony Enforcement Team, presented an Application and Affidavit for Search Warrant to a federal magistrate–not the undersigned magistrate. In the Affidavit Andrews described how on March 9 and 10, 2004, acting in an undercover capacity, she launched file sharing software and ran a search for persons sharing images of child pornography. On both dates her search located an individual using an internet protocol address and sharing images with suggestive titles. Andrews downloaded two of the files and found they contained child pornography. Further investigation linked the internet protocol address to the Internet Service Provider and eventually to a customer account in the name of Jerrold Flyer at a Tucson address.

The magistrate signed the requested search warrant on April 8th, and on April 13th it was executed at the Tucson address for Jerrold Flyer.

At the hearing defense counsel argued two grounds in support of suppression: (1) "staleness", i.e., there was nothing in the to support a finding that the child pornography described in the affidavit would still be at the subject address; and (2) a second search warrant was necessary before the agents searched the defendant's room at the subject address.

- 2 -

1  Defense counsel specifically stated he was not challenging the warrant pursuant to *Franks*
2  *v. Delaware,* 438 U.S. 154 (1978). He also stated he believed that "staleness" was purely a
3  legal issue: "The warrant's there, it's before the Court as an exhibit, and I don't think there's
4  any need to provide testimony on that issue."

### *Marlene Flyer*

Marlene and Jerrold Flyer are the defendant's parents and own the subject residence which is a two-story single family dwelling. The Flyers are geographically separated because Jerrold is an Air Force physician assigned to Luke AFB and resides in Glendale to be near that assignment. On the date of the search Marlene and her two children--the 21 year old defendant and an 18 year old daughter--resided in the Tucson residence. The defendant had occupied a bedroom in the Tucson residence since December, 2001, when he withdrew from NAU. All the bedrooms (4) and two bathrooms are on the second floor. Marlene stated she did not cook for the defendant, nor did she do his laundry or clean his room. She did not enter the defendant's room without his consent. "I respected his privacy; he was an adult child returning to the home." The defendant's room, like all the bedrooms, could be locked from the inside. He had installed no separate lock for his room. The defendant would occasionally lock his bedroom door when he left his room. He had no separate entrance into the residence. He used the family's kitchen as there were no means for preparing meals in his room. Marlene described the defendant as a "boarder" in the home, but admitted he paid no rent. "[I]n exchange for not paying me rent, he did all of the things to take care of himself."

On the morning the search warrant was executed she heard a banging on her front door around 7 a.m. When she answered the door the agents showed their badges and she opened the door as directed. She told agents her two children were upstairs and after they were brought downstairs she was taken into her bedroom and shown the warrant. The agents never asked her about the "arrangement with Andrew and his room." She did tell the agents the defendant was secretive, quiet, very introverted and did not share much.

1   On cross-examination Marlene testified the upstairs hallway was the only access to all the bedrooms and the same key--"like a little stick"-- opened all the bedroom doors. At the time of the search the defendant was unemployed and attended night classes. She and her husband paid for both the food the defendant ate and the internet service he used. She never knew if the defendant locked his bedroom door. In the downstairs den there was a computer used by the family and there were computers in her son's room which he used. She and her husband had purchased all the computers found in the defendant's room and given them to him as gifts.

### *Andrew Flyer*

He stated he moved into his parents' home because of financial considerations. They agreed he could occupy a room in the home on condition he would either be employed or attending school. He was also responsible for any and all work required to maintain their computers, "sort of in lieu of rent." He described the arrangement, "It was essentially a dorm room that my parents owned and lent to me." Family members were allowed into his room only with his permission. Everything he needed was in the room, and he spent most of his time there when in the home. He used the family kitchen to prepare his meals and did not eat meals with the others. His door had a standard thumb lock and he locked the door every time he was in room. When he left the room he would "occasionally" lock it and use a straight pin or paperclip to unlock it. He did not know whether any family member entered his room in his absence, but "trusted them to be honest."

He was present when the search warrant was executed and was not asked for consent to the search of his room.

There was a single main cable line into the residence, with separate lines to his computer and to the family's computer. He confirmed that his parents pay for all the computer/internet services at the residence.

### **DISCUSSION:**

### *Staleness*

On March 9 and 10, 2004, FBI agent Andrews engaged in the computer search activities which eventually led her to determine that an Internet Service Provider account in the name of Jerrold Flyer was being used to access images of child pornography. On April 8, 2004, 34 days later, she presented an affidavit and application for a warrant to search the address listed for that account. Defendant argues the magistrate "could not have found it 'fairly' probable' that the items sought in the search warrant would be in the premises sought to be searched based on the information he was presented in the Application and Affidavit." He notes the affidavit contains no information regarding the occupants of the subject premises or their relationship with the Internet Provider address. Furthermore, he notes "it is common knowledge that people change computer equipment often...there are widely available software programs for 'wiping' computers, disks and other media."

The defendant offers no explanation as to how further investigation regarding the occupants of the premises or their relationship to the Internet Provider address relates to the issue of staleness. The government notes the affidavit was not concerned with getting to know "Jerrold Flyer" or establishing probable cause to arrest him upon execution of the search warrant as the person known to be receiving or possessing child pornography. "The agents merely wanted to gain access to the residence to search for and recover ...images and movies depicting the sexual abuse of children." *See Zurcher v. The Stanford Daily,* 436, U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that specific 'things' to be searched for and seized are located on the property to which entry is sought.")

The government argues also that the availability of software capable of removing files from computers does not impact the "fair probability" that child pornography would befound 34 days later at the subject residence in this case. The government cites several cases wherein the courts have held that periods in excess of 34 days have not rendered search warrants "stale" in cases involving child pornography computer cases.

1         This court agrees that, without more, the mere existence of software capable of removing or erasing computer files does not undermine the sufficiency of the Application and Affidavit for Search Warrant in this case.

***Necessity for Separate Search Warrant***

        The defendant argues the agents should have obtained a separate warrant before searching his room for the following reasons: (1) the affidavit established the subject residence belonged to Jerrold and Marlene Flyer, and contained no reference to Andrew Flyer, the defendant; (2) when the agents arrived at the residence they found the defendant, the adult son of the Flyers, occupied his own room on the second floor of the residence; (3) the defendant's mother advised the agents the defendant was secretive and had divorced himself from the family; (4) and no one consented to the search of the defendant's room.

        The cases cited by the defendant are inapposite to the facts in this case. In *Bond v. United States,* 529 U.S. 334 (2000), the Court noted that a Fourth Amendment analysis embraces two questions: (1) whether the individual, by his conduct, has exhibited an actual expectation of privacy, and (2) whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable. *Id.* at 338. Applying that analysis, the Court then held that a Border Patrol Agent's physical manipulation of a bus passenger's soft luggage placed in the overhead storage space violated the Fourth Amendment. *Id.* at 339. Defendant also cites *United States v. Cannon,* 264 F.3d 875 (9th Cir. 2001), wherein the agent seeking the search warrant knew there were two structures at the address, but "reasonably" assumed the second structure was a garage. *Id.* at 877-78. However, during the execution of the warrant it was discovered the property owner had converted part of the garage into a rental unit which contained a wood burning stove, cooking stove, refrigerator, sink and bathroom. The court concluded the rental unit was "clearly a separate dwelling for which a separate warrant was required." *Id.* at 879. This court concludes that neither of these cases supports the necessity of a separate warrant to search the defendant's room in this case.

        The defendant's room was within the single family residence described in the

1  affidavit and search warrant. There was no separate entrance to his room from the outside
2  of the residence. While he apparently was free to eat meals in his room, he had no
3  refrigerator or cooking stove in his room and no separate bathroom. Although his mother
4  described him as a "boarder", she admitted he paid no rent and was free to eat the food she
5  purchased for the household. Although the defendant expected other household members
6  would "respect" his privacy and not enter his room without his consent, he did not affix
7  another lock to his room to insure his privacy. There is no evidence the defendant objected
8  to the search of his room during the execution of the warrant.
9        This court concludes there was no need for a separate search warrant before
10 searching the defendant's room.
11 **MOTION TO COMPEL DISCOVERY AND INSPECTION:**
12       The defendant asks the court to order the government to provide defense counsel
13 and his expert witness with a copy of the hard drives and removable storage media seized
14 pursuant to the search warrant. The defendant has retained Tami L. Loehrs as an expert to
15 conduct a forensic examination of the evidence in this case, and in a letter to defense counsel
16 Loehrs listed the items she would need to examine. Defense counsel forwarded a copy of
17 Loehrs' letter to the prosecutor and requested those items.
18       In its response to defendant's motion, the government "agrees that the defendant
19 should have an opportunity to have an expert examine the electronic evidence seized in this
20 case." The government is willing to make the material available to the defense for inspection
21 "at a mutually convenient time"  However, the government is not willing to provide copies
22 of the storage media and child pornography contained therein. The government argues
23 providing such copies is unnecessary under the discovery rules and would "inappropriately
24 require the government to distribute [child pornography] to others." Instead, the government
25 has offered to allow defense counsel and his expert to conduct a forensic examination of the
26 material at a secure location within the U.S. Attorney's Office. It should be noted that during
27 the hearing on this motion the government stated that, under Rule 16, it did not believe the
28

1  defendant was entitled to access to any of the requested material; however, as a "courtesy"
2  it was willing to permit access to the requested material because the defendant had retained
3  an expert capable of conducting a forensic examination.
4        Defense counsel argues this offer by the government is insufficient and
5  inconvenient, and presented the testimony of Loehrs to support this position.

6  ### *Tami L. Loehrs*

7        Loehrs identified herself as a computer forensic expert and the president of a
8  company named Law 2000 located here in Tucson. Loehrs explained how she would
9  forensically image to a second hard drive the material the government had seized from the
10 defendant's home. At her office she would then conduct various forensics examinations of
11 the materials. She explained that one test would reveal just when certain images were
12 downloaded onto the defendant's computer and it would be significant if the downloading
13 occurred when he was not present, thus indicating someone had "hacked" into his computer
14 and downloaded the illegal images without his knowledge. She also testified regarding time
15 delays she had encountered in a previous case when she had attempted to conduct similar
16 examinations at the U.S. Attorney's Office. She testified regarding the security at her
17 forensics laboratory and that none of her employees have access to her lab. Her forensics
18 machine is not connected to her network or to the Internet. She testified the defendant's
19 family is paying for her services at the rate of $200 per hour. Some of her forensics tests can
20 "run" automatically at her lab; she would not charge for those "runs' which do not require her
21 personal attention. However, when those same tests are done at the U.S. Attorney's Office
22 she would charge for all the time because she would not have equipment available to do
23 anything else while the routine "runs" were in operation. Nor would she be able during those
24 "runs" to lock her lab door and attend to other business matter as she could do at her own
25 place of business. Furthermore, she would not be able to work at the U.S. Attorney's Office
26 on weekends, or beyond normal office hours. She estimated the forensics examination in
27 this case would take between 20-40 hours; however she did not testify as to what would be
28

1  the difference in time between doing the examination at the U.S. Attorney's Office and doing
2  it at her own office. Furthermore, there was no testimony that doing her examination at the
3  U.S. Attorney's Office would compromise or taint the results.
4  She has done such forensics examinations in her office in the past, but could not
5  say if any those were for federal cases. In those cases she has kept the hard drive locked in
6  her safe until the case if over; she then forensically "wipes" the hard drive clean and submits
7  an affidavit to that effect. She testified she could also return the copied hard drives to the
8  government.
9  She also testified that she would not necessarily examine each and every image,
10 but would do a random sampling.

11 **DISCUSSION:**

12 The defendant argues that pursuant to Rule 16(a)(1)(E), Fed. R. Crim. P., and the
13 Fifth, Sixth and Fourteenth Amendments to the Constitution, he is entitled to have his request
14 granted in order to prepare a defense and meet the government's claims at trial. He cites two
15 cases to support his position: *United States v. Hill*, 322 F. Supp. 2d 1081 (C.D. California
16 2004) and *United States v. Frabizio*, 341 F. Supp. 2d 47 ( D. Mass 2004), citing *Hill*.
17 The government notes that two circuit courts have considered requests like
18 Flyer's and have held that the arrangement offered by the government in the present case
19 offers a reasonable accommodation for the interests of both sides and satisfies Rule 16.
20 *United States v. Kimbrough*, 69 F.3d 723 (5th Cir. 1995) and *United States v. Horn*, 187 F.3d
21 781 (8th Cir. 1999), *cert. denied*, 529 U.S. 1029 (2000). In their opinions both circuits
22 expressed concern that providing copies to the defense constitutes dissemination of
23 contraband which the law seeks to eliminate.
24 In both cases cited by this defendant the defense's experts did not reside in the
25 district where the cases were pending, and both district courts noted that the requirement of
26 repeated trips by the experts to view the government's evidence would be unduly burdensome
27 to the defendants. In the present case Loehrs' office is located in Tucson and, in fact, she
28

1  testified it is a five minute trip to the U.S. Attorney's Office. The government also notes that
2  in *Fabrizio* 2300 images were involved, but in the present case the total number of images
3  and movies is about 1000.
4        This court believes the government has offered a reasonable accommodation to
5  the defendant; and the defendant has not demonstrated this procedure would involve any
6  undue burden or prejudice to his trial preparation.

**RECOMMENDATION:**

      In view of the foregoing, it is recommended that, after its independent review of the record, the District Court **DENY** the Motion to Suppress and **DENY** the Motion to Compel Discovery and Inspection to the extent that motion would require the government to provide copies of the requested material to the defendant. This Report and Recommendation is being faxed to all counsel on this date. Each party may serve and file written objections within 10 days. If objections are not timely filed, the party's right to de novo review may be waived **If objections are filed, they should be directed to the District Court by omitting the magistrate's initials: CR-05-1049-TUC-FRZ.**

      The Clerk of the Court is directed to send a copy of this Report and Recommendation to all counsel.

      DATED this 26th day of May, 2006.

*/s/ Glenda E. Edmonds*
Glenda E. Edmonds
United States Magistrate Judge

(Michon)
AUSA; CNSL (Ellinwood); FRZ; GEE

COPIES DISTRIBUTED 5/26/06 MM

- 10 -